U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed October 27, 2005

United States Bankruptcy Judge

_____

IN THE UNITED STATES OF BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| MIRANT CORPORATION, et al., | § § | Case No. 03-46590 |
| | § | Jointly Administered |
| Debtors. | § | Chapter 11 |

---

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF | § | Adversary No. 05-04219 |
| EQUITY SECURITY HOLDERS | § | |
| OF MIRANT CORPORATION | § | Adversary No. 05-04221 |
| and WILLIAM K. SNYDER, in his | § | |
| Capacity as court-appointed examiner, | § | |
| and MIRANT CORPORATION, | § | |
| Plaintiffs. | § § | |
| v. | § § | |
| THE WILSON LAW FIRM, P.C., | § | |
| L. MATT WILSON, individually and in | § | |
| his capacity as counsel for the Ad Hoc | § | |
| Shareholders, FRANK SMITH, | § | |
| R. WELDON TIGNER, DAVE LUCAS, | § | |
| NACNY STERK, DAVID MATTER, | § | |
| CLARK LEWIS, HARRIS RUSH, | § | |
| JIM KELLOGG, JR., KENT KOERPER, | § | |
| PETER DEPAVLOFF, BART INGRAM, | § | |
| and MARY LEIGHT | § | |
| Defendants. | § | |

**MEMORANDUM OPINION**

## AND PRELIMINARY INJUNCTION

Before the court is the application for preliminary injunction filed by William K. Snyder, the examiner appointed in the above-captioned adversary proceeding on April 13, 2004 (the "Examiner"), and Mirant Corporation ("Mirant" and, with the Examiner, "Plaintiffs")[1] in their Verified Complaint for Declaratory Judgment and Injunctive Relief, filed on October 17, 2005. Plaintiffs ask the court to issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, Federal Rule of Bankruptcy Procedure 7065, and Section 105(a) of the Bankruptcy Code[2] prohibiting the defendants, The Wilson Law Firm, P.C. (the "Firm"); L. Matt Wilson ("Wilson"), individually and in his capacity as counsel for the Mirant Ad Hoc Shareholders Committee[3]; and Frank Smith, R. Weldon Tigner, Dave Lucas, Nancy Sterk, David Matter, Clark Lewis, Harris Rush, Jim Kellogg, Jr., Kent Koerper, Peter DePavloff, Bart Ingram and Mary Leight (collectively, "Ad Hoc Shareholders")[4], from distributing, publishing or otherwise soliciting votes to reject the Second Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and its Affiliated Debtors (the "Plan").

This court issued a temporary restraining order on October 17, 2005, after conducting a telephonic hearing during which counsel for Plaintiffs and Wilson, on behalf of Defendants, participated. The court set the application for preliminary injunction to be heard the following

---

[1] Mirant is the ultimate parent of numerous entities. Mirant and the other 82 entities that have filed chapter 11 petitions are referred to below as "Debtors."

[2] All chapter, section and code references are to the Bankruptcy Code Title 11 of the U. S. Code (the "Code").

[3] As discussed below, at the preliminary injunction hearing Wilson advised the court that, in fact, no Ad Hoc Shareholders Committee was ever organized.

[4] As described below, at the preliminary injunction hearing Wilson informed the court that the Ad Hoc Shareholders did not participate in the conduct complained of in this adversary proceeding, and Plaintiffs at that time advised the court relief was not sought in the adversary against the Ad Hoc Shareholders.

Tuesday, October 25. On October 21, 2005, Plaintiffs filed a brief in support of injunctive relief, and Defendants filed a brief in opposition.

On October 25, 2005, the court conducted a hearing to consider whether it should grant a preliminary injunction at which hearing counsel for Plaintiffs, counsel for the Equity Committee,[5] and Wilson presented evidence and argument. After consideration of the pleadings, evidence, and arguments of the parties, the court continued the TRO until midnight October 27, 2005, in anticipation of the ruling contained in this memorandum opinion.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 (a) and (b) and 157(b)(1) and (2)(A) and (O). This Memorandum Opinion comprises the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## Background

A. The Plaintiffs and their Allies

On July 14, 2003, and certain dates thereafter (collectively the "Petition Date"), Debtors[6] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. During their chapter 11 cases, Debtors have continued to operate their business.

Two official committees of unsecured creditors have been appointed by the United States Trustee (the "U.S. Trustee") pursuant to Code § 1102: one to represent the creditors of Mirant (the "Corp. Committee"); and the other to represent creditors of Mirant's second tier subsidiary, Mirant Americas Generation, LLC (the "MAG Committee"). A committee has also

---

[5] The Equity Committee also filed a complaint against Wilson, the Firm and the Ad Hoc Shareholders seeking similar relief. Although the court has not yet formally consolidated that adversary with the instant proceeding, the court permitted counsel for the Equity Committee to participate in the preliminary injunction hearing. The U.S. Trustee also spoke in support of the requested relief at the preliminary injunction hearing.

[6] Mirant and 74 other of the debtors filed chapter 11 petitions in this court on July 14 and 15 of 2003. Since then eight more debtors have initiated chapter 11 cases. The cases of all 83 Debtors have been consolidated for administrative purposes.

been appointed by the U.S. Trustee to represent Mirant's stockholders (the "Equity Committee" and, together with the Corp. Committee and the MAG Committee, the "Committees").

By order dated April 7, 2004, the court directed appointment of an examiner pursuant to Code § 1104(b), and William Snyder was selected by the U.S. Trustee and approved by the court to perform that role.

On September 22, 2005, Debtors filed the Plan along with their Second Amended Disclosure Statement of the Debtors with Respect to the Second Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and its Affiliate Debtors (the "Disclosure Statement").  The court concluded a two day hearing on the Disclosure Statement on September 30, 2005, and on the same day entered its order approving the Disclosure Statement in accordance with Code § 1125 and Rule 3017(b) (the "Disclosure Statement Order").

The Disclosure Statement Order authorizes Debtors to solicit votes to accept or reject the Plan by distributing copies of the Disclosure Statement and certain court-approved letters from each of the Committees.  The Disclosure Statement provides that solicitation of votes to accept or reject the Plan may not be made except pursuant to the Disclosure Statement and Code § 1125 (*see* note 12, below).  Solicitation packages, which included copies of the Disclosure Statement, the letters from the Committees and the other court-approved solicitation materials were distributed by Debtors to voting creditors and stockholders on October 5-7, 2005.  The deadline for voting on the Plan is November 10, 2005, at 4:00 p.m. CST.

B.    The Defendants:

The Firm purports to represent a number of equity security holders of Mirant, collectively identified herein as the Ad Hoc Shareholders. According to the Firm's Second Amended Verified Statement of the Wilson Law Firm, P.C. Pursuant to Bankruptcy Rule 2019,

filed October 5, 2005 (the "2019 Statement"), as of October 5, 2005, the Firm represented thirteen stockholders, collectively holding at least 728,470 shares of common stock of Mirant. In the 2019 Statement, the Firm discloses that it has been retained by these shareholders "incrementally since February, 2005 solely under the terms and disclosures posted on the firm website." Wilson is listed as one of these shareholders, having acquired his shares of Mirant (as well as bonds issued by Mirant) after the Petition Date. Thus, Wilson wears at least two hats in this case: 1) as equity shareholder and creditor of Mirant; and 2) as counsel for other individual shareholders of Mirant.

On its website, www.willaw.com (the "Wilson Website"), Wilson and the Firm state that they represent current shareholders of Mirant and an ad hoc committee. The Wilson Website invites other stockholders to be represented by the Firm and to become participants on the ad hoc committee by filling out an online form.

In July 2005, Wilson and the Firm filed in Debtors' chapter 11 cases a motion seeking payment of its attorneys fees and costs as counsel for the Ad Hoc Shareholders pursuant to Code § 503(b)(3) and (4). Wilson and the Firm have participated extensively in Debtors' cases since March of 2005. At that time they filed an objection to the First Amended Disclosure Statement. Wilson and the Firm filed a second objection to the Disclosure Statement, and Wilson participated in the hearing conducted on approval of the Disclosure Statement, urging the positions asserted in the two objections.

Beginning October 12, 2005, Defendants communicated certain information to shareholders of Debtors via email to clients and public postings on the Wilson Website and on two Yahoo message boards. Plaintiffs contend these postings constitute improper solicitations

of rejections of the Plan under Code § 1125(e). Specifically, Plaintiffs complain that Defendants made the following communications:

1. On October 12, 2005 at 11:45 a.m. EDT, a message entitled "Smart Shareholders Will Vote No" was posted on a Yahoo Message Board; and,

2. On or before October 12, 2005, three new links were added to the Wilson Website with the following titles:

    (a) "Why Smart Mirant Shareholders Will Vote No"

    (b) "What Do Shareholders Really Know About Mirant" and

    (c) "The Law Favors Shareholders Who Vote No."

Copies of these communications were attached to the parties' pleadings and introduced as evidence at the preliminary injunction hearing. Plaintiffs complain that these communications (collectively the "Solicitation Materials") were published in violation of Code § 1125(e) because they contain materially misleading and inaccurate factual and legal statements concerning the Plan, the Disclosure Statement, and the rights under the Code of voting creditors and stockholders. Plaintiffs consequently commenced this adversary proceeding to prevent further dissemination or use of the Solicitation Materials and seeking other, related relief.

## Issues

The court must address two issues (in addition to the four-part test for granting injunctive relief) to grant in favor of Plaintiffs a preliminary injunction. First, the court must decide whether enjoining Wilson would be an impermissible restraint on free speech. Second, the court must determine whether the Solicitation Materials contain information so misleading or false as to warrant exercise of the court's equitable powers to prevent its further dissemination.

**Discussion**

A.    Can Wilson be Enjoined?

The court has reviewed applicable case law and concurs generally with Wilson that Code § 1125 does not prohibit solicitation of rejections of a plan once a disclosure statement has been approved. The Court of Appeals for the Third Circuit so held in *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (3rd Cir. 1988), and cases decided since *Century Glove* have largely adopted its reasoning. *See, e.g., In re California Fidelity, Inc.*, 198 B.R. 567 (BAP 9th Cir. 1996); *In re Apex Oil Co.*, 111 B.R. 245, 249-250 (E.D. Mo. 1990); *In re Temple Retirement Cmty*, 80 B.R. 367, 368 (Bankr. W.D. Tex. 1987).

The court also agrees that a prior restraint on speech – even commercial speech – would ordinarily be offensive to the First Amendment of the Constitution. *See, e.g., In re Gulph Woods Corp.*, 83 B.R. 339, 342 (Bankr. E.D. Pa. 1988).

However, the court's concerns are not resolved by accepting as correct those two propositions. For two reasons the court concludes it may intervene in Wilson's solicitation efforts. First, as discussed below, the Solicitation Materials contain numerous materially incorrect statements of fact and law.[7] Misrepresentations of fact or law in a commercial context are not entitled to First Amendment protection. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562-63, 65 L. Ed. 2d 341, 100 S.Ct. 2343 (1980); *see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770, 48 L. Ed. 2d 346, 96 S.Ct. 1817 (1976). Solicitation of rejections of a plan of reorganization through the use of misleading or counterfactual materials is commercial speech

---

[7]    Although Wilson was privy to sufficient information to know that there were errors of fact and law in the Solicitation Materials, the court chooses to assume Wilson did not intend any misrepresentation but rather was simply careless in preparing the Solicitation Materials.

not entitled to First Amendment protection and does not constitute good faith solicitation within the meaning of Code § 1125(e).[8] Such speech may be subject to limitation by injunctive relief. *See In re Dow Corning*, 227 B.R. 111, 115 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."); *U.S. v. DeFusco*, 930 F.2d 413 (5th Cir. 1991) ("We agree with our colleagues of the Second Circuit that '[m]isleading commercial speech is beyond the protective reach of the First Amendment.'"); *In re Corey*, 892 F.2d 829, 838 (9th Cir. 1989) ("Because the injunction only restrains false or misleading commercial speech, it is consistent with the first amendment.").

Second, Wilson has donned the mantle of a fiduciary. By participating in these cases as a representative of shareholders, by assuming the role on the Firm's website of counsel to an "ad hoc committee,"[9] by seeking compensation for the Firm from the estate, Wilson has assumed the responsibilities and duties of a fiduciary in these cases and owes it to the constituency he purports to represent – here the common stockholders – to present only truthful and accurate information in the Solicitation Materials.

It is a well established principle of bankruptcy law that when a party purports to act for the benefit of a class, the party assumes a fiduciary role as to the class. *See Young v. Higbee*

---

[8] Section 1125(e) provides:

(e) A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

[9] At the preliminary injunction hearing Mr. Wilson advised the court that no ad hoc committee in fact exists. This does not alter the court's conclusion that Wilson was portrayed to the public through the Firm's website as a fiduciary – or that he and the Firm should be treated as such.

*Co.*, 324 U.S. 204, 65 S. Ct. 594, 89 L. Ed. 890 (1945). *See generally Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949) ("a stockholder who brings suit on a cause of action derived from the corporation assumes a position, not technically as a trustee perhaps, but one of a fiduciary character. He sues, not for himself alone, but as representative of a class comprising all who are similarly situated."). As a fiduciary, Wilson and the Firm were obligated to present in the Solicitation Materials only truthful information. Case law dealing with solicitation of rejections of a plan makes clear that the "imprimatur" of a fiduciary enhances the credibility of a solicitation. *See In re Temple Retirement Cmty*, 80 B.R. at 369 ("The clear suggestion of an alternative plan coupled with the imprimatur of the bondholder's indenture trustee too strongly suggests to innocent and far removed investors that a viable (though . . . unproved) alternative [plan] awaits if only bondholders will reject the current plan.").

Moreover, as a fiduciary, Wilson and the Firm lose such freedom of action as a person not acting for the benefit of a class and not seeking compensation from the estate may have. As fiduciaries they are answerable to the court for their conduct. Thus, while the court might not exercise control over expressions of opinion or purported statements of fact by a shareholder acting in his or her own right, it may insist that a fiduciary such as Wilson deal fairly and honestly with the class it represents.[10] *See Higbee*, 324 U.S. at 65. The court may therefore ensure that the Solicitation Materials are not incorrect or misleading.

---

[10] At the preliminary injunction hearing Wilson stated that the Solicitation Materials were his and the Firm's work only, that none of the Firm's other shareholder clients had reviewed or approved the Solicitation Materials. The court is frankly mystified how Wilson and the Firm could adopt the position that the Plan should be rejected by shareholders without ensuring that the position – one at odds with the advice of the Equity Committee and arguably contrary to the interests of all shareholders – was approved by their shareholder clients. It is not necessary that the court address the ethics issues implicated by the conduct of Mr. Wilson and the Firm, however, absent a complaint from a client of the firm.

This is especially important in the instant case given that Wilson and the Firm are practicing attorneys. It may be expected that any visitor to the Wilson Website would conclude that observations concerning bankruptcy law found there are the considered legal opinions of the Firm. An unwitting shareholder reading the Solicitation Materials (even amended as proposed by Wilson's October 20 letter[11]) could easily be misled into concluding that a better result than the Plan would be a nearly certain result of rejection of the Plan by the shareholder class. Indeed, even Wilson's postings on Yahoo could lead to this conclusion since the postings, under the name "lmattlaw" and signed by "L. Matt Wilson/matt@willaw.com" suggest Mr. Wilson's profession.

Having concluded that the court may (1) scrutinize the Solicitation Materials for accuracy; and (2) prevent dissemination or use by Wilson of false or misleading information in soliciting rejections of the Plan, the court must next review the Solicitation Materials themselves and identify deceptive or untruthful material. If the Solicitation Materials contain no inaccuracies or misleading information, even though it would have been appropriate for Wilson to obtain court approval prior to their dissemination,[12] no harm has been done. If, on

---

[11] At the preliminary injunction hearing, Wilson urged that the court consider proposed revised postings to the Wilson Website in deciding whether Plaintiffs were entitled to relief. The court does not concur. In determining whether injunctive relief is necessary, the court must look to actual conduct, not promised future conduct. Moreover, an argument that turns on the court's approval or disapproval of Wilson's proposed postings is inconsistent with Wilson's insistence that this court may not limit the content of those postings because of Wilson's First Amendment rights: Wilson's very request for court approval is virtually an admission that this court may prevent dissemination of deceptive solicitations of votes on the Plan.

[12] Wilson participated in the hearing on the Disclosure Statement, filing two extensive objections to it. The Disclosure Statement includes the following language to which neither Wilson nor any other party objected:

> No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and certain of the professionals they have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made by any such person, such information may not be

the other hand, the Solicitation Materials are flawed, then the court must act through its equitable powers to enjoin their continued dissemination.[13]

B.    Do the Solicitation Materials Contain False or Misleading Statements?

Before turning to specific misinformation in the Solicitation Materials the court will address Wilson's argument that those viewing the Solicitation Materials may check their accuracy simply by reference to the Disclosure Statement. While facially appealing, this argument is, in fact, disingenuous. The Solicitation Materials are but a few pages long, written in sound-byte style. The Disclosure Statement presents 253 pages and a score of attachments containing densely packed information and is written in a style charitably described as dry.[14] It is unrealistic to expect that a shareholder or creditor, especially one without counsel and with a relatively small holding,[15] will take the time to compare statements in the Solicitation Materials with the contents of the Disclosure Statement; rather such a stakeholder will likely find that Wilson's "Cliff Notes" approach provides a more useable source for deciding how to vote – particularly given Wilson's assurance that there is no downside to a rejection and that the Plan represents a worst-case scenario.

---

relied upon as having been authorized by the Debtors. You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the Schedules and Exhibits hereto.

[13]   In appropriate circumstances, courts have enjoined improper solicitations. *See, e.g., In re Gulph Woods Corp.,* 83 B.R. 339 (E.D. Pa. 1988).

[14]   Disclosure statements are typically modeled on SEC filings and are directed more to thoroughness than readability.

[15]   Acceptance of a plan by a creditor class requires acceptance by a majority in number of voting members of the class. Acceptance by a class of equity owners requires only the affirmative vote to two-thirds of the voted securities in amount. Code § 1126(c) and (d).

The court next turns to specific falsehoods and misleading statements in the Solicitation Materials. It is not necessary here to address every misstatement in the Solicitation Materials. Among the more egregious erroneous statements are the following:

1. Shareholders are Being Unfairly Reduced From 100% Ownership of Mirant to 3.75%[16]

While this statement is accurate to the extent that shareholders' ownership in Mirant post-confirmation of the Plan will be reduced to 3.75%, it is very misleading. In fact, approximately $6.5 billion of debt[17] will be converted to common stock. Thus, the dilution of shareholders will be offset by the effective purchase of stock through debt cancellation. Not only do creditors provide substantial consideration for the 96.25% of stock of the reorganized debtor; also the corporate balance sheet will reflect substantial (as opposed to Mirant's present, at best, marginal) equity, vastly improving the odds that the reorganized company will be able to survive and thrive in the future. Shareholders therefore will own a smaller share of a much healthier, more valuable company.

2. Warrants Permit Purchase of 10% of the Reorganized Company for $11.5 Billion[18]

This statement is simply not true. The warrants (which may be exercised on a cash free basis) provide for a strike price equal to the price of common stock that is necessary to reflect a market capitalization that would support an enterprise value of $11.5 billion. The strike price will be calculated from a total enterprise value of $11.5 billion by a mechanism derived from the methodology used in the valuation hearings for determining enterprise value.

---

[16] This point is made in all three postings.

[17] $356 million of subordinated Mirant debt is included in this number. The actual ownership percentages of stock vary slightly from the 96.25% and 3.75% numbers used in this memorandum opinion.

[18] *See* Why Smart Mirant Shareholders Will Vote No. Wilson more correctly describes the warrant strike price in What Do Shareholders Really Know About Mirant. The statement in Why Smart Shareholders Will Vote No appears to be a careless mistake.

3. There is No Downside to Shareholders Voting No[19]

This is possibly Wilson's most serious misstatement because it is an incorrect statement of the law which fails to apprise stockholders of the significant risks accompanying rejection of the Plan by the equity class. Wilson apparently believes that shareholder rejection of the Plan would lead to prompt renegotiation based on a completion of the valuation process and a resulting determination that Mirant's value is higher than $11.5 billion.[20] Worst case, Wilson predicts confirmation of the Plan, as is, pursuant to Code § 1129(b) (cramdown). Wilson fails to note that completion of the valuation process would require six weeks; a totally new valuation[21] would require about three months. Wilson also does not mention that a plan reducing the creditors' share of post-confirmation equity and increasing the stake of stockholders would quite possibly require a new solicitation of votes. *See* FED. R. BANKR. P. 3019 and Code § 1127. If, on the other hand, Mirant's value came in at less than $11.5 billion (or, probably, less than even $12 billion) creditors might demand an opportunity to change their votes. Given the six week to three month deferral of confirmation, a change in votes might be allowed.[22] Further, during the delay, another party or parties might file a competing plan.[23]

---

[19] This concept pervades the Solicitation Materials.

[20] As discussed below, in order to improve on the return to shareholders provided in the Plan an enterprise value for Mirant of at least $11.8 billion and, probably, $12 billion or more would be a prerequisite to greater return to shareholders than that provided by the Plan.

[21] Much of the "value" Wilson suggests could be found would come from changing valuation inputs from those directed by the court in its prior rulings and so would require a complete recalculation of Mirant's enterprise value.

[22] The court, of course, does not so decide.

[23] The MAG Committee sought to file its own plan previously. As prevention of that filing (or others) is dependent on continued exclusivity for Debtors under Code § 1121, it is uncertain at best whether other plans would not be filed during the time required for recalculation of value.

These are among a few of the risks inherent in a rejection strategy for shareholders. Any solicitation of rejections from shareholders which promotes Wilson's interpretation of Code § 1129(b) and does not describe these risks is misleading.

4. Shareholders Will Do Better if Mirant's Value is Greater than $11.5 Billion

Taking the $6.5 billion in claims as consideration for 96.25% of the post-confirmation Debtor's stock, for each 1% of post-confirmation stock, creditors are giving up more than $67.5 million of claims. This suggests a value to stockholders for their 3.75% of post-confirmation stock of more than one quarter billion dollars. To the extent the value of Mirant exceeds the sum of all claims against and liabilities of the enterprise plus the $250,000,000 thus afforded equity owners (or approximately $11.8 billion), a substantial share of such higher value is captured by the warrants to be issued to shareholders, the strike price of which is keyed to an $11.5 billion value for Mirant.[24] Finally, as discussed below, litigation returns will be divided 50-50 between shareholders and creditors, increasing even further the return to shareholders. In summary, the value of Mirant would at least have to exceed $12 billion to justify any improvement in shareholder treatment.

5. Is it Unfair Not to Complete Mirant's Valuation?

The Solicitation Materials broadly hint that the order of this court directing cessation of recalculation of Mirant's value pursuant to the court's prior rulings is the product of a conspiracy to avoid arriving at a total enterprise value for Mirant.[25] The court, however, has repeatedly stated on the record, as Wilson is aware, that terminating the valuation process was

---

[24] Notably the warrants have a term of five years. Thus, any increase in Mirant's value over that time would be realizable by shareholders to the extent of the warrants. Completion of the valuation process (or a fresh valuation) would not necessarily result in shareholders receiving the same sort of forward-looking securities.

[25] *See* What Do Shareholders Really Know About Mirant; The Law Favors Shareholders Who Vote No.

consistent with the preference of Congress that parties negotiate a plan of reorganization. *See In re Chateaugay Corp.,* 961 F.2d 378, 382 (2d Cir. 1992) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 220 (1977), reprinted in 1978 U.S.S.C.A.N. 5963, 6179-80); *see also In re Colonial Ford, Inc.,* 24 Bankr. 1014, 1015-17 (Bankr. D. Utah 1982); *In re ICH Corp.,* 230 B.R. 88, 92-93 (D. Tex. 1999) ("These types of transactions implicated strong policy concerns, such as . . . Congress' intent to encourage consensual workouts"). Had the valuation process continued to a final result, the incentive for settlement would be removed. Thus, the court accepted the recommendation of Debtors, the Examiner and the Committees and stopped the recalculation of value. For Wilson to solicit rejections on the basis that termination of the valuation process was some sort of plot is a misleading distortion of the facts.

6. The Increase in Natural Gas Prices in Recent Months Translates into an Increase in Mirant's Value.

Wilson states (in What Do Shareholders Really Know About Mirant) that "a $0.25 per mmbtu increase in the price of natural gas result[s] in approximately $50 million in additional income [for Mirant], on an unhedged basis." Wilson attributes this statement to the testimony of Mirant's employees during the hearings on valuation.

However, as Wilson knows, the testimony of Mirant's employees in fact was that the increased income to Mirant from a 25-cent increase in the price of gas was $25 million versus $50 million; the increase would be contingent upon other commodity prices remaining constant (which they have not); and Mirant is fully hedged as to gas prices for the next two years. Thus, the statement made by Wilson is grossly misleading. Moreover, Wilson's reference to gas prices of $14 per mmbtu is not correct. Gas prices have fallen in recent days, and it is by no means clear that the long-term trend of gas prices will place them above predictions from last

summer. Because Mirant is fully hedged, if the exceptionally high price of gas is temporary, Mirant will gain no meaningful benefit from it.

7.     Mirant Proposes to Release Current and Former Officers and Directors.

Wilson contends (in What Do Shareholders Really Know About Mirant) that current and former officers and directors of Mirant are to be released under the Plan. This is misleading for several reasons. First, the release in the Plan is the subject of several confirmation objections which may result in limitation or even elimination of the release provision. Second, the release is exclusive of certain causes of action which subsume many of the claims Mirant may have (or have had; limitations periods under Code §§ 108 and 546(a) have expired), and those causes of action are to be pursued by a trust established under the Plan. Third, Mirant's release will not affect any liability of current or former officers and directors to persons other than Mirant. Thus, importantly, several pending class actions on behalf of public security holders, including shareholders, will not be affected by the proposed release.

The latter point is particularly significant in that Wilson purchased his stock after the Petition Date and thus will not benefit from the pending class actions. Indeed, according to the 2019 Statement, Wilson has so far earned handsome profits on his Mirant securities. Implying that release of Mirant's claims (which, unlike the class actions, could redound to Wilson's benefit) would harm shareholders is misleading and especially problematic in solicitation materials given Wilson's apparent conflict of interest.

8.     Shareholders Will Receive under the Plan 50% of Causes of Action That Previously Were 100% Theirs[26]

---

[26]    *See* Why Smart Shareholders Will Vote No.

This statement in the Solicitation Materials is false in two ways. First, the causes of action of which Wilson speaks belong to Mirant, not to its shareholders. Second, if Mirant pursued the causes of action, rather than assigning them to a trust as contemplated by the Plan, they would, through Mirant, disproportionately benefit creditors.[27] Thus, in fact, the 50% share of causes of action provides more to shareholders than they would otherwise receive.

9. Other Misstatements

Among other misleading items in the Solicitation Materials are the comparison of the potential value of Mirant to the apparent value of Texas Genco in NRG's acquisition of that company; the statement that Mirant has generated a new business plan using information developed through recalculation of value pursuant to the court's valuation rulings; the statement that equity owners may require the court to continue the valuation process; the statement that "all indications are that the revised Blackstone report should opine as [sic] to . . . an additional $2 billion in value;" and the statement that a 6-8% rate of return was "mandated" for creditors of Mirant by the Supreme Court's decision in *Till v. SCS Credit Corp.,* 541 U.S. 465, 124 S.Ct. 1951, 168 L. Ed. 2d 787 (2004).[28]

C. Standards for Injunctive Relief

    1. Irreparable Harm

---

[27] Some of the causes of action are voidable transfer suits, which arguably, could not ever benefit equity owners. *See* McFarland v. Leyh (*In re* Texas Gen. Petroleum Corp.), 52 F.3d 1330, 1336 (5th Cir. 1995) ("The general policy behind the assertion of avoidance actions is that the proceeds recovered should not benefit the reorganized debtor; rather, the proceeds should benefit the unsecured creditors."); *See also* Dunes Hotel Assocs v. Hyatt Corp., 245 B.R. 492, 507-508 (D.S.C. 2000) (permitting debtor to use §544(a) to create windfall for itself and equity holder in derogation of interests of creditors is contrary to purpose of the avoidance provisions).

[28] Like other of the misstatements in the Solicitation Materials, the court's opinion resulting from the valuation hearings will address the *Till* issues. The court will issue its views on *Till* and other aspects of valuation in connection with any final decision respecting confirmation of the Plan.

Wilson contends that activity on internet message boards proves that no harm has come from the posting of the Solicitation Materials, even if they are misleading. Wilson points to other postings on message boards to show that the Solicitation Materials only have led to a useful discussion of the Plan and Disclosure Statement. Thus, Wilson reasons, absent harm, there is no basis for injunctive relief.

This argument, however, assumes that the only stockholders who have reviewed – and so could be influenced by – the Solicitation Materials were those who contributed to the message board discussions. But the postings on the Wilson Website are generally accessible to the public. Messages posted on Yahoo sites can be read and can influence readers whether or not those readers post messages of their own. The Solicitation Materials, though withdrawn from the Wilson Website, are still available on Yahoo message boards and may exert influence on voting shareholders in the future.

Should Wilson's campaign for Plan rejections succeed, the potential for harm is clear. The Plan may prove not confirmable, or confirmation may be significantly delayed. Added costs and time may affect recoveries or even Mirant's future operations.[29] Should Wilson's solicitation prevent confirmation, shareholders will quite possibly be the principal losers.

While it is certainly true that shareholders are free to run the risks inherent in rejecting the Plan,[30] they should not be enticed into doing so by false and misleading solicitation materials. Were the court to permit Wilson to solicit rejections based on such materials, and if the Plan were rejected by shareholders, the entire voting process would be fatally flawed.

---

[29] Confirmation of the Plan is a prerequisite to Mirant's exit financing.

[30] Though the court here stresses the potential harm to shareholders from rejection of the Plan, the evidence that has been presented to date is not conclusive that rejection by shareholders would not lead to a better result for shareholders.

Thus, the court concludes that there is ample evidence that enjoining Wilson is necessary to avert irreparable harm.

2. Probability of Success on the Merits

This adversary proceeding seeks injunctive relief. Because the court finds sufficient grounds for a preliminary injunction, the court concludes there is a substantial likelihood Plaintiff will succeed in obtaining a permanent injunction.

3. Balancing the Harm

As Wilson will still have a mechanism (described below) for soliciting rejections, using truthful information, the potential for harm if injunctive relief is not granted outweighs any harm to Wilson.

4. Public Interest

As a general rule, freedom of speech is a preeminent public interest. In the case at bar, however, where commercial speech is involved and the integrity of the bankruptcy process is at stake, the public interest is better served by the court exercising some control over Wilson's speech to ensure that misleading or false information is not provided to shareholders.

## Conclusion

For the foregoing reasons, Wilson and the Firm will be preliminarily enjoined from transmitting to shareholders or providing at a public site or otherwise publishing the Solicitation Materials or any similar materials; provided however, upon notice of at least one business day to the Examiner, Debtors, the Equity Committee, the Corp Committee, the MAG Committee and the U.S. Trustee, the court will approve any materials Wilson wishes to disseminate or make public respecting the Plan and Disclosure Statement if such materials do not contain any false or misleading information.

The court recognizes that the latter option may not be useful for Wilson, in that acceptances and rejections of the Plan must be received in the next 14 days. Therefore, though the court is very reluctant to suggest language to Wilson to serve his purposes, the court will approve use by Wilson, if he wishes, of the following solicitation of rejections.[31]

> L. Matt Wilson, a lawyer licensed to practice law in Georgia and the federal courts, attended and participated in valuation hearings respecting the enterprise value of Mirant Corp. In his judgment, based on his understanding of the evidence presented during those hearings, the Plan proposed by Mirant Corp. and affiliated debtors does not provide to the shareholders of Mirant Corp. treatment consistent with their legal entitlement. L. Matt Wilson further believes rejection of the Plan by shareholders would most likely lead to proposal of a plan more favorable to shareholders. L. Matt Wilson therefore urges shareholders to vote to reject the Plan as proposed by Mirant Corp.

Plaintiffs and the Equity Committee are authorized to publish, as they deem necessary, this memorandum opinion or sections of it in lieu of retractions by Wilson and the Firm of the Solicitation Materials.

It is so ORDERED.

#### END OF ORDER ####

---

[31] The court does not require use of this solicitation, nor is Wilson limited to presenting for approval a solicitation similar in form or content. The court does not mean to suggest that this language reflects its views. The court considers this an accurate reflection only of Wilson's opinions as the court understands them.